## SECURITIES & EXCHANGE COMMISSION
### v. WICKHAM.
### No. 2864.

District Court, D. Minnesota, Fourth Division.
Sept. 17, 1935.

246

John J. Burns, of Washington, D. C., and Horatio R. Rogers, of Chicago, Ill., and Charles R. Kaufman, of Washington, D. C., for plaintiff.

Guesmer, Carson & MacGregor, of Minneapolis, Minn., for defendant.

NORDBYE, District Judge (after stating the facts as above).

The regulation of interstate traffic in securities is clearly within the scope of congressional action and an appropriate field for federal regulation. The delegation of power by Congress to the commission (in the Securities Exchange Act [15 USCA § 78a et seq.]) is not now before the court. The alleged invalidity of the act in that regard could not affect the right of the petitioner to the relief sought here—

in. The defendant is not charged with the violation of any regulation or rule adopted by the commission in pursuance of such delegated power. The primary question before the court is the construction of section 2 (1) of the Securities Act of 1933, as amended by Act June 6, 1934, § 201 (15 USCA § 77b (1), and determining whether the contract in question, Exhibit A, is a security within the meaning thereof. The section referred to reads as follows:

"The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

The debacle of the stock market in 1929 has precipitated much legislation in the field of federal regulation. Congress apparently has concluded that the various state regulatory Blue Sky Commissions do not afford the public sufficient protection, and the arm of the federal government has been utilized to prevent the flow of securities in interstate commerce, or in the mails, unless the same has been approved by the government in the manner provided in the act. One may deprecate the trend of paternalism in our national government, but, obviously, government regulation and supervision in the field of securities is the result of the unscrupulous manipulations and brazen fraud that has been practiced on the public during the boom days of the past decade. Such legislation is the product of public demand, and presumably has become the established policy of most of the states, and now of the federal government. The legislation is remedial, and the ultimate objects and purposes of the act to protect investors and the public generally must be recognized.

In determining whether or not a transaction involves the issuance of a security, the courts have repeatedly announced that it will look to the substance and not the form of the transaction. Further, most courts have given a broad and liberal interpretation to the term "securities." The reports are replete with cases involving the construction of various types of investment contracts.

In State v. Robbins, 185 Minn. 202, 240 N. W. 456, a sale of contracts by fur farms relating to profit-sharing in raising muskrats was held to be a security within the meaning of the Minnesota Blue Sky Law (Mason's Minn. St. 1927, §§ 3996-1 to 4000). There, the buyer by one contract purchased the animals, and by another contract, executed simultaneously, left the animals with the company under an agreement of division of all the cash proceeds accruing from the sale of the animals and their progeny after deducting the expenses for keep, supervision, etc.

The term "investment contract" was earlier considered in State v. Gopher Tire & Rubber Co., 146 Minn. 52, 177 N. W. 937. In this case, the court was considering a certificate issued by a corporation which provided that in consideration of a sum paid by the buyer, and in consideration of his assistance in boosting or promoting the sale of the merchandise manufactured by the seller, the purchaser would share in the profits of the business. In defining "investment contract," the court stated (146 Minn. 52, page 56, 177 N. W. 937, 938):

"No case has been called to our attention defining the term 'investment contract.' The placing of capital or laying out of money in a way intended to secure income or profit from its employment is an 'investment' as that word is commonly used and understood. If defendant issued and sold its certificates to purchasers who paid their money justly expecting to receive an income or profit from the investment, it would seem that the statute should apply. The statute makes specific mention of stock, which, properly speaking, is not a security, and follows the enumeration of investments which fall within its scope with the words, 'herein called securities,' indicating that the Legislature has not used the term 'securities' in a literal, but in a broad, sense. In that sense, these certificates may properly be regarded as investment contracts or securities. The mere fact that defendant has studiously declared that they are not does not require a court to hold that they are something else."

The statute which was construed by the Minnesota court was summarized by that court as follows (146 Minn. 52, page 55, 177 N. W. 937, 938):

"All persons, firms, and corporations are prohibited from engaging, within this state, in the business of selling or negotiating for the sale of any stocks, bonds, investment contracts, or other securities issued by him or it, except securities specifically enumerated in section 2 of the act. No investment company or dealer shall sell or offer for sale, or profess the business of selling or offering for sale, securities coming within the scope of the act, unless and until he or it shall have furnished to the state securities commission information touching the honesty, good faith, and character of the business of the company or dealer, and shall have obtained from the commission a license to sell securities. Violation of any of the provisions of the act is made a gross misdemeanor."

Other cases involving various types and forms of contracts from which the buyer anticipates a return through efforts other than his own will be found in the following citations: Gracchi v. Friedlander, 93 Cal. App. 770, 270 P. 235 (1928); Stevens v. Liberty Packing Corporation, 111 N. J. Eq. 61, 161 A. 193 (1932); Brownie Oil Company v. R. R. Commission, 207 Wis. 88, 240 N. W. 827, 87 A. L. R. 33 (1932); State v. Bushard, 164 Minn. 455, 205 N. W. 370 (1925); Kerst v. Nelson, 171 Minn. 191, 213 N. W. 904, 54 A. L. R. 495 (1927); People v. McCalla, 63 Cal. App. 783, 220 P. 436 (1923); State v. Whiteaker, 118 Or. 656, 247 P. 1077 (1926); State v. Swenson, 172 Minn. 277, 215 N. W. 177, 54 A. L. R. 490 (1927).

The business of the defendant is primarily speculation in the grain and stock markets, though it appears from Exhibit A that it may extend to a variety of other fields. He assumes to have certain skill in interpreting the trend of the market and claims to operate on one of the "best chart and time systems used for market purposes today." The purchaser of the contract puts up the money for the venture. The defendant contributes his skill, experience, and time. The earnings, if any, are divided 60 per cent. to the purchaser and 40 per cent. to the defendant trader. The financial losses are all sustained by the purchaser. It appears that the funds obtained from the various persons who participate with the defendant in these speculative enterprises are all deposited and commingled in one or more bank accounts in the name of the defendant. The various advertisements and prospectuses refer in alluring terms to prof-

its to be made, or which could have been made, if the timely advice of the defendant had been acted upon. Only incidental reference is made to the possible losses. In actual operation of the plan, the contract holder has no voice in the type of speculation in which his money shall be invested, and all of the details of purchases and sales are handled by the defendant. The public invests its money in a scheme or plan of speculation which is exclusively handled by the defendant, and apparently relies entirely on the presumed skill, honesty, and experience of the defendant trader.

It should be observed that the transactions, of which Exhibit A is a specimen, are not merely isolated contracts, but by extensive newspaper advertising and otherwise defendant makes it a business to solicit funds from the public. A large number of these contracts have been issued to investors in the state of Minnesota and in interstate commerce, and substantial sums have passed through defendant's hands into the market. In referring to the depositor as a partner, it must be obvious that such reference does not stamp a transaction as a partnership. Mere division of profits does not constitute a partnership. The investing public expects to receive a profit or income from such investment, not by joint efforts, but by reason of the claimed skill, knowledge, and experience of the defendant and the possible good luck that he may have in his various ventures.

If we assume, for instance, that a race track habitue invites the public to pool its funds with him, and, in return for the various sums deposited, he issues a certificate entitling each holder to participate proportionately in the earnings that may result from his wagers with such money by reason of his knowledge, experience, and possible inside tips on horse races, it would not seem that one would have any difficulty in characterizing such transaction as the issuance of an investment contract, or as a participation in a profit-sharing agreement within the meaning of the act. The analogy is quite applicable and appropriate to the present situation. Both constitute the investment of money with the expectation of profits; both carry with them the idea that the investor will receive profits through efforts other than his own. Whether one invests money in the proverbial gold mine where he receives a certificate evidencing his contribution and resulting interest in the profits which are antici-

pated, or invests in a speculative venture by reason of the claimed skill and experience of a grain and stock market manipulator to make profits, the transactions cannot be rationally distinguished in determining the dealings which Congress intended to regulate in using the term "investment contract." Both are investments that the law seeks to supervise and regulate to prevent abuses and afford the investing public some measure of protection. Both entail the issuance of a security. In one the investor expects profits by reason of the gold to be mined; in the other, by reason of the skill and experience of the defendant in the market. In both, the opportunities for fraud are notorious.

■ In any event, if resort must be made to any other portion of the act, the phrase "certificate of interest or participation in any profit-sharing agreement" is amply inclusive to embrace the contract in question. The court does not consider Dame v. Lee (Ga. Sup.) 178 S. E. 752, cited by the defendant, as controlling. Further, the court is of the opinion that the constitutionality of the Securities Act of 1933 must be sustained, so far as that question is before the court on this motion.

Defendant seriously urges that the investigation of the commission in the instant case preparatory to the filing of the present bill was in violation of defendant's constitutional rights. It appears that the order for investigation was regularly issued by the secretary of the commission, and that an officer of the commission was duly designated to administer oaths, subpœna witnesses, and generally conduct the hearing. Further, that prior to the issuance of the order, the commission was in possession of information that amply supported the commission in ordering the hearing. When the hearing was conducted, the defendant rested on his constitutional privileges and refused to testify. He was not ordered to testify by the examiner, nor was he required to produce any books or papers. The only evidence produced before the commission was obtained from employees, government investigators, and the various trading firms with which defendant did business. Before the testimony closed, the defendant was invited to produce additional testimony before the commission, but refrained from introducing any evidence. The testimony before the commission may not fairly reflect the entire picture with reference to defendant's business transactions and his financial standing, but the defendant cannot complain that there is an absence of a complete showing. It may be observed, however, that the contention that he is now insolvent has not been denied. No showing is made that the commission intends to make any illegal use of the information obtained at these hearings. The court is clear that the defendant has no just complaint by reason of the manner in which the hearings were conducted, and, further, no substantial prejudice to the rights of the defendant has resulted, or will result, on account thereof. Manifestly, the commission, within legal limits, has the right to make an investigation before applying to the court for injunctive relief. The contention that the commission in conducting the investigation was arbitrary and unfair cannot be sustained.

■ The court finds, therefore, that the defendant is an issuer of securities within the scope and purview of section 2 (1) of the Securities Act of 1933, as amended (15 US CA § 77b (1); that such securities have not been registered under the act; that the defendant has issued said securities in interstate commerce and through the United States mails; and that, therefore, the relief granted herein is, under the law, justified and consonant with the provisions thereof.

The disavowal filed by the defendant to the effect that, since the institution of these proceedings, he has abandoned, or intends to abandon, all interstate solicitation of business does not justify a denial of the motion made herein. The local newspaper advertising, which he still continues, obviously extends beyond the borders of this state.

Let this memorandum be made a part of the foregoing order.